VERMONT SUPERIOR COURT
Franklin Unit
17 Church Street
St. Albans VT 05478
802-524-7993
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 21-CV-01474

---

Misty McCartney v. David Burns, et al

---

## FINDINGS, CONCLUSIONS, AND ORDER

In this case, Plaintiff Misty McCartney seeks declaratory and injunctive relief, as well as damages under various legal theories, all arising out of an ongoing dispute over rights with respect to a driveway located partially on her property and partially on the neighboring property owned by Defendants David Burns and Melissa Haberman. Defendants counterclaimed, seeking essentially mirror-image relief. The parties tried the declaratory and injunctive relief claims in this case to the court over two days in June of 2024; the remaining claims were set over for jury trial. Before that trial could occur, the parties agreed to waive jury and try their remaining claims to the court. Accordingly, the court then ruled on the claims for declaratory and injunctive relief, reserving findings until after the close of the evidence on the remaining claims.

Trial on those claims commenced on October 28, 2024 and continued on October 29, 2024; the trial was then suspended due to a medical emergency. Trial concluded on February 26, 2025. At the conclusion of the evidence, both parties moved to conform the pleadings with the evidence, asserting cross-claims for nuisance; the court granted the request. Subsequently, on its own motion, and with the consent of the parties, the court further conformed the pleadings to the proof to set forth claims for reformation of the parties' deeds. Both parties submitted proposed findings and conclusions. Having received and reviewed those submissions, the court issues the following findings, conclusions, and order—all by a preponderance of the credible evidence.

## FINDINGS

The parties own neighboring properties, with the gravel drive at the heart of this case between them. The gravel drive is located substantially on Ms. McCartney's property, with approximately three feet of its width located on Defendants'. The gravel drive has never been properly delineated; as with many dirt drives, its bounds have varied over time. Both parties, in their pleadings, admit that this is a "shared" drive.

The two properties are located south and west of Route 118—Ms. McCartney's to the northwest of Defendants'. Defendants also own a property to the southeast of the property at issue here; they reside in that property and rent out the subject property (for the sake of clarity, the court refers to the subject property as the "Rental Property," and Defendants' neighboring property as "Defendants'' home property"). Ms. McCartney's property consists of an irregularly shaped lot on which sit a house and barn, with the house closer to the road and the barn offset slightly behind it. The Rental Property also consists of an irregularly shaped lot on which sit a house and barn, again with the house closer to the road and the barn directly behind it. The house sits on what has been called Parcel One, a parcel that is rectilinear on all but the streetfront side; the barn sits on Parcel Two, a rectilinear parcel that is 12 feet narrower on Ms. McCartney's side than Parcel One. To put it another way, the property line between the two properties makes a 12-foot jog to the left at the southwest corner of Parcel One

Ms. McCartney's title dates back to one W.G. Mansfield, who in 1905 owned both Ms. McCartney's property and the Rental Property. At that time, Mansfield conveyed Parcel One of the Rental Property to Rushford, retaining what became Ms. McCartney's property and what subsequently became Parcel Two of the Rental Property. In this conveyance, Mansfield reserved a right of way, over Parcel One, "at any and all times for the purpose of removing manure from my barn and shed and adjoining thereto." Precisely where the barn and shed were located does not appear; the evidence supports the inference that the "barn" was what is now Defendants' barn on Parcel 2, and the "shed," what is now Ms. McCartney's barn on the rear of her parcel.

In 1920, one M.H. Downey, who evidently then held title to Parcel One by virtue of a decree from the Probate Court, conveyed the parcel to Hattie Haile. The deed specifically reserved the right of way reserved in the deed from Mansfield to Rushford. Subsequent deeds in Defendants' chain of title are silent with respect to the right of way. There is no evidence, however, that it was ever abandoned.

After the conveyance of Parcel One to Rushford, it appears that Mansfield continued to own Ms. McCartney's parcel, as well as Parcel Two of the Rental Property. While the full chain of title is not in the record, it appears that the property passed to Abbie Jo Mansfield (W.G.'s widow?). In 1937, her Administrator conveyed the property to Richard H. Pond. It then passed, through a series of conveyances, to Jesse Noble Gilbert and Ruth Noble Gilbert.

In 1974, the Gilberts conveyed Parcel Two, through a straw transaction involving a local attorney, to Marion Towle, who then owned Parcel One. The conveyance of Parcel Two included "a right of way twenty feet (20') in width for ingress and egress of vehicular and pedestrian traffic, to be

used in common with the grantors, their heirs and assigns. The width of said right of way shall be measured from the northerly edge of [Parcel One]." Clearly, however, whoever described this right of way did so with complete ignorance of the actual boundary line of Parcel One or the location of what eventually became Ms. McCartney's house; the "northerly edge of [Parcel One]" is a mere 11 feet from Ms. McCartney's house. Indeed, the distance between the two houses is only slightly more than 22 feet.

With the conveyance of Parcel Two to Marion Towle, title to Parcels One and Two merged, passing through an intermediate deed to Arthur and Erin St. Onge to James Healy, who took title on June 1, 2001. Prior to that transfer, on August 30, 2000, Defendant Haberman and her then co-owner conveyed an easement over Defendants' home property to the St. Onges for a shared right of way to be used as a driveway. That easement ran with the land and so transferred to Healy when he acquired the property; in fact, the deed from St. Onge to Healy expressly conveyed the right of way. Healy owned the property until he executed a deed in lieu of foreclosure on March 10, 2016—significantly, just shy of 15 years. Defendants acquired the property in August 2016, and have owned it since. Defendants never occupied the Rental Property; since approximately three years after their acquisition of the property, Defendants have used it as a rental.

In the meanwhile, Ms. McCartney's property passed through two intermediate deeds to Christopher McLernon, who purchased it on October 15, 2004. For the entire time that McLernon owned the property, there was a gravel drive located between the two properties. Healy and his tenants used the drive with the understanding that it was a resource shared by the two neighboring properties. Without objection from McLernon, Healy would park one car alongside his house and another alongside his barn. There is no evidence, however, that such use persisted for more than the 11-plus years when Healy and McLernon were neighbors. Indeed, until very recently Defendants prohibited their tenants from parking on Ms. McCartney's side of the house.

For reasons that do not appear, Healy had the property surveyed by H.W. Chaffee Surveying in August 2012. That survey accurately and precisely laid out the boundary lines of the Rental Property, including the shared boundary with Ms. McCartney's property; it also accurately depicted the location of the various structures then (and now) existing, and the location and scope of the gravel drive as it existed at that time. At the edge of the town highway right-of-way, the gravel drive is slightly more than 15 feet wide; by the time it reaches a point parallel to the corner of Ms. McCartney's house, it has narrowed to approximately 10 feet, maintaining that approximate width for the rest of its length to Ms. McCartney's barn. For the first 59 feet (approximately) of its length, approximately 3.75 feet of the

gravel drive's width lies on Defendants' side of the property line, with the remainder on Ms. McCartney's side. In its current configuration, however, the gravel drive extends farther onto the Rental Property, such that it is not possible to park adjacent to Defendants' house without also parking in part within the gravel drive. Nevertheless, there is sufficient room between the two houses (barely) to allow each party to park vehicles alongside their houses without interfering with the other's right of access.

Ms. McCartney purchased her property from McLernon in 2019. Soon thereafter, for reasons that do not properly appear, Mr. Burns began behaving towards Ms. McCartney and her property rights in a manner that could most charitably be characterized as passive-aggressive. Mr. Burns, who previously had been allowed the use of a lawnmower owned by McLernon (which was sold with the property to Ms. McCartney) asserted rights of ownership over the mower. He also arrogated to himself the right to use a dumpster located on Ms. McCartney's property. Soon thereafter, Mr. Burns approached Ms. McCartney with a copy of the Chaffee survey; he told Ms. McCartney that he wanted the tenants at the Rental Property to park in the shared driveway. This was an odd request; there is abundant room to park multiple vehicles in the drive between Rental Property and their home, and the rental property had benefited for years from an easement for parking in that space. When Ms. McCartney pointed out that she had a copy of the survey, and that it made clear that the shared driveway afforded Defendants an easement for ingress and egress only, Mr. Burns walked away.

The next day Mr. Burns began what became a persistent, provocative, and pernicious campaign of interference with Ms. McCartney's property rights. Over the ensuing days, months, and years, Mr. Burns would deliberately park his vehicle in the shared driveway in a way calculated to park Ms. McCartney in, or to make it nearly impossible for her to get into or out of her car. On a much more sporadic basis, Ms. Haberman did the same. It is clear, however, that she was aware of and endorsed Mr. Burns's activities; when Ms. McCartney would send emails complaining of interference with her property rights, Ms. Haberman would not even extend the courtesy of acknowledging their receipt. And when Ms. McCartney asked a lawyer friend to send a letter asking Defendants to cease and desist, the behavior escalated.

It bears emphasis that on none of these occasions was Ms. McCartney acting in any way in purposeful derogation of Defendants' property rights. To be sure, there is evidence that on occasion, Ms. McCartney had multiple vehicles parked on her property, including at least partially in the shared drive, and on at least a few occasions, one of those cars was parked on Defendants' side of the property line. These incursions, however, were at most sporadic and minimal, caused no damage, and resulted

in no meaningful interference with Defendants' property rights. There is no evidence, for example, that Defendants ever used the shared drive for "ingress or egress"; the lease for the Rental Property required their tenants to park in the easement for that purpose between the Rental Property and Defendants' home property. Defendants themselves never resided in the Rental Property and never used the shared drive to access their barn; they accessed the barn from their home property's side of the Rental Property.

Instead, Mr. Burns used the shared drive only to park in ways calculated to frustrate Ms. McCartney's rights—all while there was ample parking on Defendants' side of the Rental Property. And while it was theoretically possible for him to have parked entirely on the Rental Property, and in a way that did not interfere with Ms. McCartney's right of ingress and egress, he deliberately chose not to do so. Indeed, there were multiple incidents in which Mr. Burns waited—sometimes until the wee hours of the morning—until Ms. McCartney had parked and exited her vehicle before moving his truck from wherever it had been parked to a spot clearly intended to make it difficult, if not impossible, for Ms. McCartney to exit the property. At times, he parked his truck so close to Ms. McCartney's car that she had to crawl in through the passenger door to get into her driver's seat. On other occasions, before Ms. McCartney had returned home at the end of the day, he parked his truck in such a way as to make it extremely difficult, if not impossible, for Ms. McCartney to use the shared drive. He also, during snow events, would deliberately shovel snow from the Rental Property into snowbanks in the shared drive and even onto Ms. McCartney's property, again with the clear purpose and effect of interfering with Ms. McCartney's exercise of her property rights. The upshot was that Ms. McCartney took to having a portion of her front yard plowed so that she had a place to park where Mr. Burns could not obstruct her ingress and egress.

While Mr. Burns acknowledged at least some of these incidents, he attempted to minimize and explain them away. The court rejects these attempts as incredible. The unmistakable conclusion is that Mr. Burns acted intentionally to interfere with Ms. McCartney's property rights.

Fortunately, this behavior caused little physical damage to Ms. McCartney's property. On one occasion, Ms. McCartney asked Defendants to move a metal cabinet that they had left in her barn. Mr. Burns refused the offer from Ms. McCartney's boyfriend to help move it into Defendants' barn and instead moved it just over the property line; the only reason for declining the offer of help and leaving the cabinet on the property line can have been to annoy Ms. McCartney. There it sat until blown over by the wind, causing approximately $500 damage to a truck owned nominally by Ms. McCartney's boyfriend but beneficially by her. On another instance, Mr. Burns pulled his truck so close to Ms.

McCartney's car that the running board caused damage to the fender of Ms. McCartney's car; she bought a replacement fender for $450 but chose not to pay to have it installed, instead selling it with the car. And on at least one occasion Mr. Burns deliberately left a pile of animal feces at the foot of Ms. McCartney's back steps.

The real damage was emotional. It bears emphasis that neither the behavior nor the harm rose to the level that would support a claim for intentional infliction of emotional distress. Rather, while the behavior was petty and infantile, it was not "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Davis v. Am. Legion, Dep't of Vermont,* 2014 VT 134, ¶ 20, 198 Vt. 204. Equally, Ms. McCartney could not be said to have suffered "distress so severe that no reasonable person could be expected to endure it." *Id.* Nevertheless, Defendants' incessant harassment did take a toll. There were incidents too numerous to catalog here in which Mr. Burns's behavior had its intended effect, causing Ms. McCartney annoyance, discomfort, and inconvenience well beyond what one might be expected to endure in a civilized society. As a consequence, Ms. McCartney became more or less housebound, fearful of going outside lest Defendants harass her. She became hypervigilant, and lost sleep. Her mother observed her to become melancholy and depressed. And the conflict with Defendants took an emotional toll on Ms. McCartney's relationship with her then-boyfriend. It also had an impact on her work, with days when she was stuck at home, having been parked in.

## CONCLUSIONS

On these facts, the court turns first to the dispute over the boundary between the Rental Property and Ms. McCartney's property and the parties' rights with respect to what all have referred to as the "shared drive" between the two properties. Here, the parties agree that the Chaffee survey accurately depicts the property line. They also agree, through their pleadings and repeated references throughout the case, that both parties have rights to the "shared drive"; the disagreement is over the scope and purpose of the easement that underlies the shared drive.

That easement was first created by Mansfield in 1905, and operated in favor of both Ms. McCartney's property and Parcel Two of the Rental Property. The 1974 deed to Marion Towle, with its reference to an easement "to be used in common with the grantors, their heirs and assigns," confirmed that the easement was reciprocal. The evidence establishes beyond a reasonable doubt, however, that the deed description of a 20-foot-wide right of way over Ms. McCartney's property in favor of the Rental Property, measured from the property line, reflects a mutual mistake as to both the

location of the property line and the distances between the two houses and between the property line and each of the houses. The parties to the 1974 deed cannot have intended to create a right of way that extended nine feet into what is now Ms. McCartney's house. Rather, they intended to clarify that what had theretofore been only a right of way over Parcel One of the Rental Property in favor of Ms. McCartney's property had become by practice a shared right of way located between the two properties. The subsequent behavior of Healy and McClernon was fully consistent with this understanding.

" 'Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction in writing, . . . through the mistake common to both parties, . . . the written instrument fails to express the real agreement or transaction.' " *LaRock v. Hill*, 131 Vt. 528, 530–31 (1973) (quoting *Churchill v. Capen*, 84 Vt. 104, 107 (1911)). The party seeking reformation must prove mistake beyond a reasonable doubt. *deNeergaard v. Dillingham*, 123 Vt. 327, 331 (1963). Here, the evidence establishes beyond a reasonable doubt that the 1974 deed reflects a mutual mistake as to both the location and the scope of the easement for a shared driveway. The parties to that deed cannot have intended that the drive sit entirely on Ms. McCartney's property; nor can they have intended to create a right of way so wide that neither could park vehicles on their own property without obstructing the right of way. Thus, the court concludes that it is necessary to reform the deed to express the true intent of the parties. *See Massucco v. Koldziej*, 2024 VT 76, ¶ 12 ("The court may reform a deed to what 'the deed and extrinsic evidence indicate [the parties] must have intended.' ") (quoting *Cassani v. Hale*, 2010 VT 8, ¶ 17, 187 Vt. 336). That intent, as informed by both the historical reservation of a right of way over Parcel One and more recent practice confirmatory of historical usage, was to formally recognize a shared right of way running between the two houses, of sufficient width to allow ingress and egress, and related maintenance activities, without interfering with the right of either property owner to park alongside each's respective house.

The court concludes that the only way to reflect that intent, consistent with the location of the two houses and the boundary line between them, is to reform the deed in two respects. First, the court concludes that the right of way, to be truly "shared," must pass equally across the two properties; this conclusion is bolstered by the observation that the boundary line between the two properties roughly bisects the space between them. Second, to assure that the right of way is wide enough for reasonable use and maintenance without interfering with the parties' right to use their properties to park next to

their respective properties, the court concludes that the right of way should be only 15 feet wide, with the actual shared drive limited to 8 feet in width.

The court turns next to Ms. McCartney's nuisance and trespass claims. The Complaint set forth trespass claims against Defendant Burns alone (Counts I and III); Ms. McCartney subsequently amended the Complaint to assert these claims (and others asserted in the original Complaint) against both Defendants. At trial, the parties agreed to amend both Amended Complaint and Counterclaim to add claims for nuisance, in order to conform the pleadings to the evidence. Because Ms. McCartney's trespass and nuisance claims are based on the same general course of conduct, the court addresses them together.

"A person who intentionally enters or remains upon land in the possession of another without a privilege to do so is subject to liability for trespass." *Harris v. Carbonneau*, 165 Vt. 433, 437 (1996). Private nuisance, in contrast, is "a substantial and unreasonable interference with a person's interest in the use and enjoyment of land." *Jones v. Hart*, 2021 VT 61, ¶ 26, 215 Vt. 258. "An interference is substantial if it exceeds 'the customary interferences a land user suffers in an organized society,' and unreasonable if 'the gravity of the harm outweighs the utility of the actor's conduct.' " *Id.* (citations omitted). The doctrines differ also in the kinds of harm that must be proven to support a damages award. "Unlike private nuisance, which requires 'substantial harm as a liability threshold,' trespass is 'liability-producing regardless of the degree of harm the invasion cause[s].' " *Id.* ¶ 66 (citation omitted). Thus, in trespass, "even when there is no evidence of damages, invasion of private property rights still requires 'some recognition, even if only by way of nominal damages.' " *Id.* (citation omitted). There is a further distinction in the measure of damages: "while annoyance and discomfort damages are available in both private nuisance and trespass, the scope of such damages is narrower for private trespass and is limited to trespasses that cause substantial bodily harm or serious sickness." *Id.* ¶ 69.

Applying these principles here, the court concludes the Ms. McCartney has proven both a series of trespasses and a continuing private nuisance, both committed by Mr. Burns. It notes that there is evidence that Ms. Haberman and Ms. McCartney (or her boyfriend or guests) may also have trespassed on occasion, but those trespasses were nominal, and effected no meaningful interference with property rights. And unlike Mr. Burns's trespasses, which were purposefully calculated to annoy and harass, the court cannot conclude that either Ms. Haberman or Ms. McCartney acted with such intent. Thus, the court concludes that neither Ms. Haberman's nor Ms. McCartney's trespasses warrants an award of even nominal damages. With respect to Mr. Burns's trespasses, the only evidence of actual harm is the

property damage to Ms. McCartney's vehicles and her discomfort and annoyance. The discomfort and annoyance, however, did not rise to the level of actual bodily harm or sickness; thus, it will support no more than an award of nominal damages in trespass.

The same cannot be said, however, for Ms. McCartney's nuisance claims. In this regard, it is clear that Mr. Burns engaged in a "sustained and intentional campaign to annoy" Ms. McCartney. *See id.* ¶ 37. "Although such campaigns primarily involve only discomfort and annoyance—and therefore cause relatively little harm, as compared to other categories of interferences—they qualify as a private nuisance because the harassment and annoyance is repeated over a prolonged period and the activity causing the interference has no utility." *Id.* And while nuisance law "does not concern itself with trifles, or seek to remedy all the petty annoyances of everyday life in a civilized community," *id.* ¶ 30 (quoting *Rattigan v. Wile*, 841 N.E.2d 680, 686 (Mass. 2006)), "if the activity causing the interference has no utility, less harm is required to demonstrate that an interference causing discomfort and annoyance is unreasonable." *Id.* ¶ 36. Thus, in a context strikingly similar to the facts of this case, our Court has recognized: "One specific example of an activity that has no utility is a person intentionally annoying and harassing a neighbor." *Id.* The Court has further recognized that in such cases, an award of damages for annoyance, discomfort, and inconvenience is appropriate. *Id.* ¶ 58.

Here, the findings above make clear that Mr. Burns subjected Ms. McCartney to far more than "the petty annoyances of everyday life in a civilized community," and that his actions had no utility other than causing her annoyance and inconvenience. The findings also make clear that the campaign was successful; as noted in the ultimate paragraph of the findings above, in addition to the innumerable discrete incidents of interference with Ms. McCartney's property rights, Mr. Burns caused her emotional distress that, even if it did not rise to the level necessary to sustain a claim for intentional infliction of emotional distress, is fully compensable in nuisance law. annoyance, discomfort, and inconvenience well beyond what one might be expected to endure in a civilized society. In short, the evidence makes clear that Ms. McCartney is entitled to a more than nominal damages award in nuisance.

On Ms. McCartney's trespass claims against Mr. Burns, the court concludes that she is entitled to recover actual damages in the amount of $950 for the physical damage to her two vehicles. She is also entitled to nominal damages for the multiple discrete trespasses; the court concludes that $50 is a reasonable award in that regard. As noted above, neither Ms. Haberman's nor Ms. McCartney's incidental trespasses resulted in meaningful interference with the other property owner's rights; thus, the court declines to award even nominal damages for those trespasses.

On Ms. McCartney's nuisance claim, the Supreme Court has made clear that "[w]here an abatable nuisance is found to exist, the award of damages can properly include both compensation for the lost use of property (calculated on the basis of diminished rental or use value) and compensation for personal injuries such as annoyance, discomfort, and inconvenience." *Coty v. Ramsey*, 149 Vt. 451, 464 (1988). Here, there clearly is an abatable nuisance, but there is no evidence of compensable loss of use of property. There is, however, abundant evidence of annoyance, discomfort, and inconvenience. Taking its lead from the jury award in *Jones v. Hart*, where the defendant's conduct was of a character similar to, if slightly more egregious than Mr. Burns's here, but over a slightly longer period of time, the court concludes that an award of $15,000.00 represents reasonable compensation for Ms. McCartney's annoyance, discomfort, and inconvenience.

In light of the persistent and provocative nature of Mr. Burns's behavior, the court concludes further that a permanent injunction is necessary to foreclose further violations of Ms. McCartney's rights. Also, as noted above, both Ms. McCartney and Ms. Haberman each committed acts of trespass—albeit without either the intent or impact of Mr. Burns's. Thus, the court will include them in the sweep of the injunction.

In all other respects, the court concludes that both parties have failed to prove their claims. The absence of findings pertinent to those claims is intentional. The court need not recite all the facts it has not found. Instead, it suffices to observe that the court has carefully considered the parties' allegations and cannot find by a preponderance of the evidence that either side has proved all of the essential elements of claims other than those specifically addressed above. Specifically, the court rejects Ms. McCartney's claims of battery, intentional or negligent infliction of emotional distress, harassment and intimidation (to the extent that is even a cognizable claim), and defamation as unproven; equally, it rejects Defendants' prayers for relief 4–7 for failure of proof.

## ORDER

The court grants both sides' request for a declaration as to the boundaries between their properties and as to the bounds of and rights to use of the shared drive, and for an injunction governing further use of the drive:

1.  The boundary between the parties' properties is accurately reflected on the survey created by H.W. Chaffee Surveying on August 12, 2012, as recorded in the Town of Montgomery Town clerk's Office on November 26, 2012.

2.  The parties' properties are both benefited and burdened by a right of way 15 feet in width, bisected for the first 58.86 feet of its length by the property line between the two properties. This right

of way exists for the purpose of pedestrian and vehicular access to each property by any persons with right or permission to access that property, as well as for the maintenance of a gravel drive 8 feet in width, also bisected for the first 58.86 feet of its length by the property line between the two properties. Defendants shall have no right to maintain the right of way after the first 58.86 feet except to remove vegetation to allow access to the barn located on the rear of their property. If during any calendar year Defendants make any use of the shared right of way, they shall share that year's costs of maintenance equally with Ms. McCartney.

3. Neither party shall park within the 8-foot gravel drive (meaning within 4 feet of the boundary line between the two properties); nor shall either party park so as to interfere with snow removal or other maintenance activities when such are reasonably to be anticipated. Except in the event of a snowstorm or other emergency, any party intending to undertake any maintenance of the right of way shall give the other party at least 24 hours' notice of such intent. In the event of snow, whenever the NOAA spot forecast for the Village of Montgomery predicts 2 or more inches of snow over the next 12 hours, neither party shall park within the right of way until snow removal activities are complete.

4. This declaration and injunction shall run with the land.

The court awards judgment to Plaintiff on her trespass claims in the amount of $1,000.00, consisting of $950 for property damage, and $50 in nominal damages. On Plaintiff's nuisance claims, the court awards Plaintiff $15,000.00. In addition, as the substantially prevailing party, Plaintiff is entitled to recover her costs. V.R.C.P. 54(d)(1). Plaintiff shall submit her verified bill of costs within 14 days of this Order; Defendants will then have 7 days to object. The court will include those costs it determines to be allowable in the judgment required by V.R.C.P. 58. That document will include the above declaration of rights and permanent injunction. The parties shall cause the Judgment to be recorded in the land records of the Town of Montgomery, with the costs of such recording shared evenly between the two sides.

Electronically signed pursuant to V.R.E.F. 9(d): 6/11/2025 3:14 PM

_____
Samuel Hoar, Jr.
Superior Court Judge